■ In the Matter of GARY GAMBUTI, as Chief Executive Officer of St. Lukes-Roosevelt Hospital, Petitioner. MADELINE BOWSER, an Alleged Incapacitated Person, Appellant. [662 NYS2d 757] —Order, Supreme Court, New York County (William Mc-Cooe, J.), entered May 13, 1996, which, after a hearing, ap-

pointed a special guardian for Madeline Bowser, and authorized said special guardian to, *inter alia,* transfer Ms. Bowser to an appropriate long-term care facility, unanimously reversed, on the law, without costs, the appointment and authorization vacated, and the matter remanded for further proceedings.

On February 26, 1996 petitioner Gary Gambuti, in his capacity as Chief Executive Officer of St. Lukes-Roosevelt Hospital, filed a petition in the Supreme Court, New York County, seeking the appointment of a guardian for Madeline Bowser, an allegedly incapacitated person, pursuant to article 81 of the Mental Hygiene Law. In the petition, Gambuti alleged that Bowser, who was 92 years old and had been living at the hospital since January 6, 1996, was suffering from dementia and was "unable to make decisions regarding her discharge plan, health care needs and living arrangements". An affirmation signed by a resident in psychiatry at the hospital confirmed Bowser's condition. The petition requested that the guardian be given authority to manage Bowser's financial affairs, and to make necessary decisions regarding her future health care needs, including transferring her involuntarily to a long-term health care facility if required.

Bowser had been receiving home care services and was assisted by a friend, Dorothia Alston, prior to her admission to the hospital. The petition alleged, however, that Bowser's home care services were terminated due to Alston's interference with the home care providers. Petitioner further alleged that Alston referred to herself as Bowser's "legal guardian", and that Alston adamantly opposed transferring Bowser to a nursing home.

A hearing on the petition was held on April 2, 1996. By order dated April 4, 1996, the IAS Court denied the appointment of a guardian, without prejudice, since no clear and convincing showing was made that Bowser was likely to suffer harm, and because "preference should be given to her wishes". The court acknowledged that transfer of Bowser to a nursing home might seem "the safest course", but deferred to Alston's desire to continue to provide for Bowser "as she has done for many years". The court also directed that Mental Hygiene Legal Services monitor Bowser's progress, and report to the court in 3 months.

However, during the next month, the IAS Court was informed that Alston could not fulfill her expressed desire to adequately care for Bowser. Petitioner again moved, by order to show cause dated May 13, 1996, for the appointment of a

guardian. This time, the court granted the application to the extent of appointing Anthony J. Lamberti, Esq. as special guardian, finding that the "[i]ncapacitated [p]erson is likely to suffer harm because she is unable to provide for personal needs or adequately understand and appreciate the nature and consequence of such inability." Pursuant to the court's order the special guardian was given the power to make all health care decisions, including effectuating a transfer to a long-term health care facility. The special guardianship was to terminate after Bowser was safely moved, and her financial matters, including the transfer of her Medicaid payments to the facility, were properly settled. The special guardian was required to report to the court all actions taken in fulfillment of his duties "prior to the expiration of the term of the appointment". Bowser appealed this order.

Shortly after the court's May 13, 1996 order, the special guardian arranged for Bowser to be transferred to Isabella Geriatric Center, where she currently resides. On or about August 31, 1996, the parties stipulated that the special guardian would refrain from relinquishing Bowser's apartment while she reapplied for home care services. Bowser's application for home care services was denied on or about October 31, 1996, and her apartment was surrendered shortly thereafter.

The special guardian was discharged by order of the IAS Court on April 11, 1997. By letter submitted to this Court on April 18, 1997, the special guardian stated he believed this appeal was moot due to his discharge.

On appeal, Bowser contends that her involuntary commitment to the nursing home by a special guardian was not authorized under the Mental Hygiene Law. We agree. Under section 81.02 (a) of the Mental Hygiene Law, the court may appoint a guardian for a person if the court determines (1) "that the appointment is necessary to provide for the personal needs of that person * * * and/or to manage the property and financial affairs of that person" and (2) "the person agrees to the appointment, or * * * is incapacitated as defined in subdivision (b) of this section." Under subdivision (b), a person is incapacitated if clear and convincing evidence exists that "a person is likely to suffer harm because: 1. The person is unable to provide for personal needs and/or property management; and 2. The person cannot adequately understand and appreciate the nature and consequences of such inability". Notably, section 81.22 of the statute authorizes the court to grant an appointed guardian the power to place an incapacitated person in a nursing home or residential care facility (Mental Hygiene Law § 81.22 [a] [9]).

However, article 81 also provides alternatives to the appointment of a guardian in certain circumstances. Subdivision (b) of section 81.16, titled "Protective arrangements and single transactions", states in pertinent part: "If the person alleged to be incapacitated is found to be incapacitated, the court without appointing a guardian, may authorize, direct, or ratify any transaction or series of transactions necessary to achieve any security, service, or care arrangement meeting the foreseeable needs of the incapacitated person, or may authorize, direct, or ratify any contract, trust, or other transaction relating to the incapacitated person's property and financial affairs if the court determines that the transaction is necessary as a means of providing for personal needs and/or property management for the alleged incapacitated person * * * The court may appoint a special guardian to assist in the accomplishment of any protective arrangement or other transaction authorized under this subdivision * * * [who] shall have the authority conferred by the order of appointment."

Bowser argues that section 81.16 (b) does not authorize the involuntary commitment of an alleged incapacitated person. She asserts that the type of protective arrangements and transactions contemplated by the statute are far less intrusive than the loss of liberty involved here. She claims that since the reporting requirements for guardians are much stricter than for special guardians,* she will not be adequately monitored, and in the event her condition improves, no one will be available to seek modification of her care and living arrangements. She notes that since her special guardian has been discharged, her placement in a nursing home is effectively "irrevocable".

While we do not accept all of these assertions, we agree that the involuntary commitment of an incapacitated person by a special guardian is not authorized by section 81.16 (b), and that appointment of a full guardian would be required for that action. Several provisions of article 81, and the Law Revision Commission Comments thereto, support this conclusion. In section 81.01 the Legislature expressed its concern for the individual liberty interests of incapacitated persons by stating that "it is desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs but, at the same time, permits them to exercise the independence and

---

* Compare the requirements of a guardian's annual report in section 81.31, with the requirement that special guardian "shall report to the court on all matters done pursuant to the order of appointment," found in section 81.16 (b).

self-determination of which they are capable" (*see generally*, *Matter of Wogelt*, 223 AD2d 309, 313).

Further, section 81.31, pertaining to the annual reporting requirements of a guardian, shows the critical importance the Legislature ascribed to the monitoring of guardianships. According to that section, the guardian must include in the annual statement, "any major changes in the physical or mental condition of the incapacitated person" (Mental Hygiene Law § 81.31 [b] [3]), "an evaluation of the incapacitated person's condition and the current functional level of the incapacitated person" (§ 81.31 [b] [5]), and a "statement of whether the current residential setting is best suited to the current needs of the incapacitated person" (§ 81.31 [b] [6] [i]). As the Law Revision Commission Comments state: "Given the loss of liberties involved in the guardianship process and the vulnerability of persons under guardianship, it is critical that the court regularly receive and review basic information about the well-being of the ward" (Law Revision Commission Comments, reprinted in McKinney's Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.31, at 422).

In contrast to the situation where a guardian is appointed, we believe that the statutory mechanism for the appointment of a special guardian under section 81.16 (b) inadequately addresses the liberty concerns of incapacitated persons in the context of an involuntary commitment. Although a special guardian is required to report to the court "on all matters done pursuant to the order of appointment" (*ibid.*), there are no well-defined and tailored requirements as in section 81.31. Further, the focus of section 81.16 was obviously intended to be transactional and temporary, and the involuntary commitment to a nursing home, with its severe effect on the individual liberty and autonomy of the ward, hardly fits this characterization. Also, as is demonstrated in this case, the discharge of the special guardian after a short duration leaves the incapacitated person without the close protection article 81 was intended to provide such persons. Indeed, rather than rendering this appeal academic, as the former special guardian stated to this Court, the special guardian's discharge cogently demonstrates the inadequacies of the appointment of a special guardian in Ms. Bowser's case. For all these reasons, we reverse the IAS Court's order and remand this matter for further consideration.

In light of this disposition, there is no necessity to reach the constitutional claims raised. Concur—Milonas, J. P., Nardelli, Williams, Mazzarelli and Andrias, JJ.